UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LINDSEY TUTTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-01257-TWP-DKL |
| | ) | |
| ADVANCED ROOFING SYSTEMS, INC. | ) | |
| d/b/a ADVANCED COMMERCIAL | ) | |
| ROOFING, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendant Advanced Roofing Systems, Inc. ("Advanced Roofing") (Filing No. 32). Following an involuntary separation of employment from Advanced Roofing, Plaintiff Lindsey Tuttle ("Ms. Tuttle") initiated this lawsuit, alleging wrongful termination and workplace harassment based on religion and pregnancy. Advanced Roofing moved for summary judgment, asserting that Ms. Tuttle was lawfully terminated because of insubordination and the evidence does not support her claims. For the following reasons, the Court **GRANTS in part and DENIES in part** Advanced Roofing's Motion for Summary Judgment.

## I.   BACKGROUND

The following statement of facts are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Ms. Tuttle as the non-moving party. See *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

Advanced Roofing is a commercial roofing company located in Muncie, Indiana, that provides roofing materials and services to commercial property owners.  Joe Jackson is the owner and president of Advanced Roofing.  Joe's son, Ryan Jackson, is the general manager.  Both Joe and Ryan Jackson are members of the Church of Jesus Christ of Latter-day Saints, commonly called Mormons.  Religion is not a factor in employment decisions at Advanced Roofing.  Joe Jackson is aware of four employees at Advanced Roofing who are Mormon:  himself, his son Ryan, Floyd Mason ("Mr. Mason"), and one other employee.

Ms. Tuttle is a member of Center Chapel, an independent church with basic Christian teachings.  She was interviewed for about twenty minutes by Ryan Jackson before she was hired by Advanced Roofing.  During the interview, there were no questions about religion or church affiliation and Ryan Jackson never asked her about her religion or faith and never mentioned his own religion.

Ms. Tuttle began working for Advanced Roofing in April 2012 as the company's "lead scheduler."  She earned $11.00 per hour plus commission on sales.  Ms. Tuttle never received an employee handbook or employee policies and practices manual and there were no specific attendance or call-in procedures that were enforced.  Throughout her employment, Ryan Jackson, the general manager, was her direct supervisor and she would report her absences to Ryan.

Advanced Roofing employed between twenty and twenty-five employees in its Muncie, Indiana headquarters as well as sales representatives in Kentucky, Indiana, Florida, and Illinois.  Between ten and fifteen of Advanced Roofing's Muncie employees were telemarketers and two employees—Brynisha Bonner ("Ms. Bonner") and Calvin Richards—were telemarketing managers.

2

At Advanced Roofing, telemarketers usually make the initial contact with prospective customers. When a prospective customer responds positively to a telemarketer's call, the telemarketer refers the call to Advanced Roofing's lead scheduler. The lead scheduler then follows up with prospective customers by arranging a meeting between the customer and a sales representative. Ms. Tuttle was the only lead scheduler during her time of employment with Advanced Roofing.

The lead scheduler is an important position at Advanced Roofing because many employees' incomes are affected by the lead scheduler's work performance. The telemarketing staff are paid bonuses if the sales representatives quote work for customers, and the sales representatives are paid commission on sales. The ability of Advanced Roofing's sales representatives to timely follow-up on leads is dependent on the lead scheduler promptly setting appointments with prospective customers. Thus, telemarketers and sales representatives rely on the lead scheduler to do her job well so that they can earn commissions and bonuses. Advanced Roofing's "outside employees" were totally dependent on the lead scheduler to schedule appointments so that they could make a living.

Ms. Tuttle was not married during her employment at Advanced Roofing. While she was employed, she became pregnant in the early part of 2013. Ms. Tuttle told only two people about her pregnancy: general manager, Ryan Jackson, and telemarketing manager, Ms. Bonner. No one at Advanced Roofing said anything to Ms. Tuttle about her pregnancy, and nobody said anything with religious connotations about her pregnancy. She did not receive any negative feedback about the pregnancy (Filing No. 34-4 at 19).

On Thursday, February 28, 2013, Floyd Mason began working for Advanced Roofing as the sales and marketing manager, a newly created position in the company. Advanced Roofing

hired Mr. Mason because Ryan Jackson did not have enough time to oversee everything himself as the general manager.  Mr. Mason was tasked with increasing sales and growing the company. He was given managerial authority over the telemarketers, telemarketing managers, outside and inside sales people, and the lead scheduler (Ms. Tuttle).  His authority included basic human resources functions, including hiring and firing.

Ms. Tuttle was absent from work on Monday, March 4, 2013.  She missed work that day because she did not feel well.  She reported her absence that day, directly to Ryan Jackson.

On Tuesday, March 5, 2013, Ms. Tuttle worked in the morning.  Ms. Tuttle met Mr. Mason for the first time on March 5, 2013.  According to Ms. Tuttle, no one told her that Mr. Mason was to be her supervisor, she did not know his job title, and Ryan introduced Mr. Mason only as the new sales and assistant manager.

Mr. Mason recalls meeting with Ms. Tuttle that morning and instructing her that if she was going to be late or absent from work, she needed to call him directly because he was her supervisor (Filing No. 34-5 at 5–6).  He gave Ms. Tuttle his cell phone number and watched her enter the number into her own cell phone.  Mr. Mason testified about this exchange during his deposition:

> I told her to call me.  If she was ever going to be late or miss work, you had to call me.  And that I – you know, she put her personal – my phone number, my cell phone number, in her phone so she'd have it – ready access to it and everything.  I did that at her desk on Tuesday.

(Filing No. 34-5 at 7.)

Ms. Tuttle left work around lunch time on March 5, 2013.  Ms. Tuttle had a previously scheduled doctor's appointment that afternoon that she had previously informed Ryan Jackson about, however, she did not feel well enough to attend the appointment.  Mr. Mason asserts that Ms. Tuttle called him to say that she was not going to return to work that afternoon because she was not feeling well (Filing No. 34-5 at 5).

Ms. Tuttle acknowledges that she met with Mr. Mason during the morning of Tuesday, March 5, 2013 (Filing No. 34-4 at 6; Filing No. 58-1 at 1), but she disputes that Mr. Mason instructed her to call him if she was going to be absent from work, and she disputes that Mr. Mason gave his cell phone number to her and that she called him later that day.  (*Id.*)  However, Mr. Mason's cell phone record shows that he received a call from Ms. Tuttle's cell phone, 765-717-8868, on Tuesday, March 5, 2013, at 1:08 p.m., which lasted about five minutes (Filing No. 34-7 at 1).  Ms. Tuttle confirmed during her deposition that 765-717-8868 is her cell phone number (Filing No. 34-4 at 17).  Confronted with the cell phone record, Ms. Tuttle recalled "informing someone at Advanced on March 5, 2013 that she was not returning for the afternoon, but does not recall specifically speaking with Floyd Mason."  (Filing No. 41 at 4.)  Regardless, Ms. Tuttle maintains that she believed Ryan Jackson was still her immediate supervisor.

The next day, Wednesday, March 6, 2013, Ms. Tuttle did not report to work because she was experiencing a miscarriage.  She did not call Mr. Mason to inform him of her absence, instead Ms. Tuttle contacted Ryan Jackson on the morning of Wednesday March 6, 2013 to report that she would not be at work due to a potential miscarriage.  (Filing No. 42-3 at 7.)  Ms. Tuttle also called Ms. Bonner, and informed her that she was having a miscarriage.  At 4:37 p.m. on Wednesday, Ms. Bonner sent an email to Ryan Jackson.  The email explained:

> Lindsey [Tuttle] just called and told me that she has to go back to the doctor tomorrow at 9.  She said she hasn't finished miscarrying yet.  I don't know much about it but I guess it's a process?  She said she didn't feel comfortable telling Floyd [Mason].
>
> I feel sorry for her.  She told me today her mom died (whatever day she died but it was on a Wednesday)..(sic) now the miscarriage and today's her birthday.  Some birthday.
> I don't think she really wanted the pregnancy anyway, from what she told me.  She told me you and me are the only ones she told about it.

(Filing No. 34-9.)  Ryan Jackson received the email, however, he did not tell Mr. Mason about the email that he received.

On Thursday, March 7, 2013, Ms. Tuttle called Ryan Jackson to let him know that she would not make it to work that day.  Ryan Jackson informed Mr. Mason that Ms. Tuttle would not be at work that day.  On either March 7 or March 8, 2013, Ryan Jackson informed Mr. Mason that Ms. Tuttle was having a miscarriage.

On Friday, March 8, 2013, Ms. Tuttle called Mr. Mason to inform him that she would not make it to work because she had suffered a miscarriage.  According to Mr. Mason's cell phone record, Ms. Tuttle called him from her cell phone, 765-717-8868, at 8:24 a.m.  This call lasted about four minutes (Filing No. 34-7 at 1).  During this call, Mr. Mason told Ms. Tuttle that her employment with Advanced Roofing was terminated.  Mr. Mason acknowledges that he learned that Ms. Tuttle was pregnant and experiencing a miscarriage before he informed her that she was being terminated.  Mr. Mason completed a Termination Notice that provided Ms. Tuttle was terminated effective March 8, 2013.  (Filing No. 42-4 at 9).

Mr. Mason alleges that he decided to end Ms. Tuttle's employment with Advanced Roofing on Wednesday March 6, 2013 because she had not called him directly to let him know that she was not going to be at work that day.  He viewed Ms. Tuttle's failure to follow the instruction to call him if she was going to be absent as insubordination.  He asserts that his decision of termination was based on this perceived insubordination and the importance of Ms. Tuttle's position within the company.  Mr. Mason also alleges that he was unaware that Ms. Tuttle was unmarried, pregnant or experiencing a miscarriage when he made the termination decision.  Joe Jackson and Ryan Jackson were not involved in Mr. Mason's decision to terminate Ms. Tuttle's employment with Advanced Roofing.

After her termination, Ms. Tuttle filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission, and this lawsuit followed. In her Complaint, Ms. Tuttle alleges wrongful termination and workplace harassment based on religion and pregnancy. Advanced Roofing moved for summary judgment, asserting that Ms. Tuttle was lawfully terminated because of her insubordination.

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits

7

of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

Summary judgment is not a substitute for a trial on the merits; nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918,920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327,1330 (7th Cir. 1989).

### III.   DISCUSSION

Advanced Roofing requests summary judgment on Ms. Tuttle's claims of wrongful termination and workplace harassment based on religion and pregnancy. They assert that Ms. Tuttle was lawfully terminated because of her insubordination, and argue that Ms. Tuttle cannot establish a *prima facie* case of wrongful termination or workplace harassment. Ms. Tuttle asserts that the designated evidence establishes numerous factual disputes as to whether her out of wedlock pregnancy and miscarriage were motivating factors for her termination and as to whether Advanced Roofing's proffered reason for termination is credible or mere pretext. The Court will address each claim in turn.

### A.   Workplace Harassment Claim

While not alleged as a separate count in her Complaint, Ms. Tuttle alleges workplace harassment, or a hostile work environment, based on religion because Advanced Roofing

"demanded" that she distribute pamphlets on Mormonism to "all" visitors to the Muncie office and that she "expressed concern" about this "job requirement," the failure of which subjected her to "adverse employment action and discipline."   (Filing No. 1 at 3, ¶11.)  She alleges in her Complaint that Advanced Roofing's owner and managers "repeatedly distributed Mormon information to Tuttle" and "consistently requested" that she attend a Mormon church (Filing No. 1 at 3, ¶12).  Ms. Tuttle further alleges that in the fall of 2012, owner Joe Jackson "instructed" all employees in Muncie to attend a "mandatory" meeting on "joining the Mormon religion," which "all" Muncie employees attended, and at which Ms. Tuttle was "instructed" to hand out Mormon literature (Filing No. 1 at 3, ¶13).  Finally, after the "mandatory company meeting," members of the Mormon Church, "at the request of Advanced," "would routinely visit" Ms. Tuttle's home (Filing No. 1 at 3, ¶14).

> To prevail on a hostile work environment claim, [a plaintiff] must demonstrate that: (1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her religion; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability.  In determining whether the evidence in support of a hostile work environment claim meets this standard, we consider the totality of the circumstances, including the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance.

*Porter v. City of Chicago*, 700 F.3d 944, 955–56 (7th Cir. 2012) (citations and quotation marks omitted).  Advanced Roofing concedes for summary judgment purposes that Ms. Tuttle subjectively felt uncomfortable in her workplace at Advanced Roofing.  However, Advanced Roofing argues, there was nothing objectively offensive at Advanced Roofing, and no "religious" conduct was severe or pervasive.

In contrast to the allegations in her Complaint, Ms. Tuttle acknowledged in sworn deposition testimony that the religion-based allegations in her Complaint are inaccurate.  She

concedes that she was hired after a twenty minute interview during which religion was not discussed (Filing No. 34-4 at 4).  Concerning her allegation that Advanced Roofing "demanded" that she distribute pamphlets on Mormonism to "all" visitors to the Muncie office, Ms. Tuttle testified that during the approximately first four months of her employment, she worked at a desk near the entryway to Advanced Roofing's building, and there was a stack of Mormon literature on a shelf near her desk.  She was asked to offer it to visitors.  She did not express concern to management about this and was never told there would be adverse consequences if she failed to distribute the literature (Filing No. 34-4 at 10–11).

In her Complaint, Ms. Tuttle alleges that she "expressed concern" about the "job requirement" of distributing Mormon literature.  However, Advanced Roofing points out that during her deposition, Ms. Tuttle clarified this allegation:

> Well, I expressed concern within myself, only because I'm here to do a job. And as far as job security, if I didn't do it, what were the consequences.
> Q. So you didn't express concern to Joe –
> A. No.
> Q. – or Ryan?
> A. No. No, they – no.
> Q. So maybe it might be more accurate to say you had concern?
> A. Correct, yes.
> Q. And did not express it?
> A. Correct.

(Filing No. 34-4 at 10.)

In her Complaint, Ms. Tuttle further alleges that failing to fulfill the "job requirement" of distributing Mormon literature subjected her to "adverse employment action and discipline." Again, Advanced Roofing points to Ms. Tuttle's deposition testimony to refute this allegation.

> Q. Okay. And the last sentence says, if you fail to distribute Mormon information to visitors, you – it says Tuttle was subjected to adverse employment action and discipline.
> A. No, I wasn't. That "was" is not correct. I was in fear of losing my job had I not done what they had requested for me to do.

10

Q. And that's not because of anything Joe or Ryan told you, is it? If you don't
distribute this literature, you're fired, or words to that effect?
A. They did not tell me that, no. Did it cross my mind sometimes, if I didn't go as
far as their religion was, you know, will they fire me? I don't know. So I did what
I was told.
Q. But they didn't tell you that unless you distribute this, you're going to lose your
job?
A. No.
Q. Or we're going to dock your pay or anything bad like that?
A. No.

(Filing No. 34-4 at 10–11.)  Ms. Tuttle admits that she was not subjected to or threatened with

adverse employment action or discipline in relation to offering or failing to offer Mormon literature

to Advanced Roofing's guests.

Ms. Tuttle alleges in her Complaint that Advanced Roofing's owner and managers

"repeatedly distributed Mormon information to Tuttle" and "consistently requested" that she attend

a Mormon church, and yet, she "refused to attend a Mormon church and was subjected to disparate

treatment as a result."  (Filing No. 1 at 3, ¶12).  When asked about these allegations, Ms. Tuttle

testified that Joe Jackson invited her to attend his church more than once, but she thought that he

never expected her to go to his church.  She acknowledged that no one at Advanced Roofing said

that "something bad might happen" if she did not attend the church.  Ms. Tuttle also acknowledged

that Joe Jackson never came back to her to express that he did not see her at his church (Filing No.

34-4 at 11).  Regarding being subjected to disparate treatment for failing to attend Joe Jackson's

church, Ms. Tuttle testified that she "felt as if [she] was going to be."  She explained that it was

"weird" and "awkward" at work but that Joe Jackson never said anything about potential adverse

actions for failing to attend his church; it was just her own fear (Filing No. 34-4 at 12).  She did

not know of anyone who suffered any negative employment action as a result of religion and had

not even heard any rumors to that effect.  *Id.*  Ms. Tuttle testified that she does not think she was

treated differently than other employees of Advanced Roofing because of her faith or lack of

interest in the Mormon Church.  *Id.*  When asked whether she believed her "failure to inquire further or participate in the Mormon faith or attend the Mormon Church was a reason why the company discharged [her]," Ms. Tuttle replied, "No." (Filing No. 34-4 at 19.)

Lastly, Ms. Tuttle alleges in her Complaint that in the fall of 2012, owner Joe Jackson "instructed" all employees in Muncie to attend a "mandatory" meeting on "joining the Mormon religion," which "all" Muncie employees attended, and at which Ms. Tuttle was "instructed" to hand out Mormon literature (Filing No. 1 at 3, ¶13).  After the "mandatory company meeting," members of the Mormon Church, "at the request of Advanced," "would routinely visit" Ms. Tuttle's home to discuss her joining the Mormon Church (Filing No. 1 at 3, ¶14).

Regarding this fall 2012 company meeting, Joe Jackson reports that the meeting was not mandatory; rather, employees were invited to attend.  However, Ms. Tuttle believed the meeting was mandatory because she "was told to log out and come to the meeting" (Filing No. 42-3 at 5). Joe Jackson held the meeting because in the fall of 2012 Mitt Romney was running for President of the United States, and Mr. Romney is a member of the Mormon Church.  Mr. Romney's candidacy generated public discussion and interest about the Mormon Church, so Joe Jackson thought it would be of interest to his employees to learn first-hand, accurate information about the Mormon Church (Filing No. 34-2 at 4).  Ms. Tuttle did not know that Mr. Romney is a Mormon (Filing No. 34-4 at 12).  Contrary to the allegations in the Complaint, not all Muncie employees attended the informational meeting.  Rolanda Woods is one employee who did not attend.  She explained, "The meeting was optional; I did not attend the meeting myself; no one in the ownership of the company has ever tried to force their belief on myself or any other employee." (Filing No. 34-3 at 3.)

Mormon missionaries visited Ms. Tuttle's home three times, but she never interacted with them.  She did not answer the door the first two times they came to her home.  The third time they came to her home, her father answered the door and told the missionaries that she was not home even though she was standing inside on the stairway (Filing No. 34-4 at 13–14).  Joe Jackson acknowledged that he is acquainted with Mormon missionaries in the Muncie area, but he has "never provided these missionaries with home addresses or other personal contact information of our employees, and never requested they call on our employees."  (Filing No. 34-2 at 3.)  Ms. Tuttle presented no evidence to dispute this.  During her deposition, Ms. Tuttle admitted that she has no evidence that anyone at Advanced Roofing sent the missionaries to her home, and she was purely speculating that there was a connection between Advanced Roofing and the missionaries showing up at her doorstep (Filing No. 34-4 at 14).

Regarding her workplace harassment claim, Ms. Tuttle failed to respond to Advanced Roofing's summary judgment argument and evidence.  Instead, Ms. Tuttle focused her summary judgment response on the wrongful termination claim based on her pregnancy and miscarriage.  The designated evidence shows that the "objectively offensive" and "severe or pervasive conduct" elements of a workplace harassment claim cannot be met in this case.  Further, the designated evidence shows that the allegations in the Complaint regarding a workplace harassment claim are unsupportable.  Therefore, Advanced Roofing is entitled to summary judgment on this claim.

**B.**     **Wrongful Termination Claim**

Ms. Tuttle also asserts a claim of wrongful termination based on religious and sex discrimination. Advanced Roofing explains that it is entitled to summary judgment on this claim because Ms. Tuttle was lawfully terminated because of her insubordination, and the evidence shows that Ms. Tuttle cannot establish a *prima facie* case of wrongful termination.

"[T]he Pregnancy Discrimination Act . . . amended Title VII to state that discrimination 'because of sex' includes discrimination 'because of or on the basis of pregnancy, childbirth, or related medical conditions.'"  *Hall v. Nalco Co.*, 534 F.3d 644, 646 (7th Cir. 2008) (quoting 42 U.S.C. § 2000e(k)).

As with other Title VII claims, a plaintiff asserting discrimination on the basis of pregnancy, childbirth, or related medical conditions may prove such discrimination through either the direct or indirect method.  *Griffin v. Sisters of St. Francis, Inc.*, 489 F.3d 838, 844 (7th Cir. 2007).  Under the indirect method, a plaintiff must prove that: "(1) she was pregnant and her employer knew she was pregnant; (2) she was performing her duties satisfactorily; (3) she was fired; and (4) similarly situated employees not in the protected class were treated more favorably." *Id.*  If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.*  If such a reason is given, the plaintiff can survive summary judgment only by showing that the reason is pretext for intentional discrimination.  *Id.*  "Alternatively, the plaintiff may proceed under the 'mixed motives' or direct method, in which case the plaintiff may avoid summary judgment by producing sufficient evidence, either direct or circumstantial, to create a triable issue as to whether pregnancy was a motivating factor in her discharge."  *Marshall v. American Hosp. Ass'n*, 157 F.3d 520, 525 (7th Cir. 1998).  Furthermore,

> [t]he focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered.  We do not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision. Our only concern is whether the legitimate reason provided by the employer is in fact the true one.

*Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) (citations omitted).

These same standards apply to claims for wrongful termination based on religious discrimination.  *See Martino v. W. & S. Fin. Group*, 715 F.3d 195, 201–02 (7th Cir. 2013).

### 1.     <u>Wrongful Termination based on religious discrimination</u>

The Court first addresses Advanced Roofing's assertion that Ms. Tuttle abandoned or waived her claim of wrongful termination based on religious discrimination by failing to respond to Advanced Roofing's arguments concerning the claim.  Advanced Roofing explains that "[a]bsent any discussion of a legal claim and reference to a factual basis for it, [Ms. Tuttle] has waived her claim of discharge based on religion and her hint of religious harassment."  ([Filing No. 57 at 1](.).)  "Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."  *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 773 (7th Cir. 2015) (quoting *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009)).

Upon review of Ms. Tuttle's response to Advanced Roofing's Motion for Summary Judgment, the Court determines that Ms. Tuttle has abandoned her claim of wrongful termination based on religious discrimination.  She failed to cite any legal authority to support a religious discrimination claim.  Every case cited by Ms. Tuttle for her substantive argument was a pregnancy/sex discrimination case.  No case cited by Ms. Tuttle involved a religious discrimination claim.  In fact, Ms. Tuttle advanced no arguments concerning her religious discrimination claim.  Her single, brief mention of religion in response to the summary judgment motion was included as part of her argument for the pregnancy discrimination claim, where she asks the Court to make an inferential leap from religious principles of a church to a decision to wrongfully terminate employment because of an out-of-wedlock pregnancy.  In her sole mention of religion, Ms. Tuttle claims:

> Equally as important, however, is the undisputed evidence that both Ryan Jackson and Floyd Mason are devout Mormons who strongly disfavor out-of-wedlock

pregnancies.  And, it is undisputed that both Ryan Jackson and Floyd Mason were aware that Tuttle's miscarriage was the result of an out-of-wedlock pregnancy prior to Tuttle's official termination.  In addition, there is evidence that Advanced's owner – Joe Jackson – insisted upon Tuttle joining the Mormon faith without success.  The designated evidence establishes that the Mormon faith is an integral part of the Advanced's business philosophy and clearly important to both the Jacksons and Floyd Mason.

(Filing No. 41 at 15.)  To support these assertions, Ms. Tuttle points to deposition testimony of Ryan Jackson and Mr. Mason as well as a record in her personnel file.  (*See* Filing No. 34-1 at 6; Filing No. 42-4 at 10.)

However, this evidence does not support Ms. Tuttle's claims that Ryan Jackson and Mr. Mason were aware that she was not married and that she was suffering a miscarriage of an out-of-wedlock pregnancy.  Asked whether he knew if Ms. Tuttle was married, Ryan Jackson testified, "I don't.  I don't believe that she was."  "Q. Was there a point in time during her employment that you were certain that she wasn't married?  A. No." (Filing No. 34-1 at 6.)  When Mr. Mason was asked, "Do you know if she was married?" he responded, "I don't know."  (Filing No. 58-6 at 2.)  The record in Ms. Tuttle's personnel file indicating a marital status of "single" was not signed by Ryan Jackson or Mr. Mason but rather by a different supervisor (Filing No. 42-4 at 10).  There is no evidence indicating that Ryan Jackson or Mr. Mason ever saw this record in Ms. Tuttle's personnel file.

Therefore, any religiously based claim of discrimination through inferences that Mr. Mason and Ryan Jackson's religious beliefs are in opposition to out-of-wedlock pregnancy, they were aware that Ms. Tuttle was pregnant and not married, and thus, she was fired because of religious discrimination fails.  The evidence shows that Mr. Mason and Ryan Jackson were not aware of Ms. Tuttle's marital status, and her inference is unsupportable.

Additionally, Ms. Tuttle's religious discrimination claim was abandoned because she advanced no argument or legal authority to support such a claim. Her "out-of-wedlock pregnancy" theory concerning the Mormon Church's position on pregnancy outside the marital relationship is not supported by the evidence.

### 2. Wrongful Termination based on pregnancy discrimination

Turning to Ms. Tuttle's claim of wrongful termination based on pregnancy discrimination, Ms. Tuttle asserts that she can establish discrimination under both the direct and indirect method. Regarding the indirect method, it is undisputed that Ms. Tuttle meets the first four prongs. The designated evidence establishes that: (1) Ms. Tuttle was pregnant and suffered a miscarriage; (2) she was terminated; (3) Ms. Tuttle was qualified for the position and performing her duties satisfactorily; (4) and, at the time of her termination on March 8, 2013, both Mr. Mason and Ryan Jackson were aware of Ms. Tuttle's pregnancy and miscarriage.

With respect to similarly situated employees that were not pregnant were treated more favorably, Ms. Tuttle argues that similarly situated employees were not disciplined for attendance-related issues. She asserts, and it is not disputed, that prior to Mr. Mason's arrival employees at Advanced Roofing could "come and go as they pleased without any adverse employment actions." Ms. Tuttle was terminated within a week of Mr. Mason's arrival, so there are no other employees to compare with prior to her termination. Ms. Tuttle compares herself to employees Daniel Weaver and Katrina Kaufman, who were dating, unmarried, and expecting a child together. They also were fired by Mr. Mason. Advanced Roofing argues that Mr. Weaver and Ms. Kaufman were fired for repeated attendance-related issues, not insubordination, and they each worked as telemarketers, not the only lead scheduler, which was a critical position in the company (Filing No. 34-5 at 6). However, Advanced Roofing's EEOC notice expressly stated the reason for Ms.

Tuttle's termination was both insubordination *and* attendance. At minimum, Ms. Tuttle has established a question of fact as to the existence of a *prima facie* case of pregnancy discrimination under the indirect approach.

A plaintiff can survive a summary judgment under the direct method, "by producing sufficient evidence, either direct or circumstantial, to create a triable issue as to whether pregnancy was a motivating factor in her discharge." *Marshall v. American Hosp. Ass'n*, 157 F.3d 520, 525 (7th Cir. 1998).

Advanced Roofing argues that it had a legitimate, nondiscriminatory reason for Ms. Tuttle's termination—her insubordination. The Seventh Circuit explained that "when the defendant offers a legitimate, nondiscriminatory reason for the adverse employment action, courts may begin with the pretext inquiry." *Martino v. W. & S. Fin. Group*, 715 F.3d 195, 202 (7th Cir. 2013) (citing *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007)). "In this analysis, pretext means a lie, specifically a phony reason for some action." *Martino*, 715 F.3d at 202 (citation and quotation marks omitted).  As the Court already has noted, "[t]he focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered. . . .  Our only concern is whether the legitimate reason provided by the employer is in fact the true one." *Stewart*, 207 F.3d at 378.

A plaintiff may show pretext by presenting "evidence that demonstrates that (1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the discharge; or (3) the proffered reasons were insufficient to motivate the discharge." *Wolf v. Buss Am. Inc.*, 77 F.3d 914, 919 (7th Cir. 1996).

To make her argument for pretext and a *prima facie* case of discrimination, Ms. Tuttle asserts that she was never warned, disciplined, or terminated after her absences from work when

she suffered a severe burn and when her mother died, and yet, she was quickly terminated when she was absent from work because of her out-of-wedlock pregnancy and miscarriage. In response, Advance Roofing argues that Ms. Tuttle requested time off work when she suffered the severe burn and when her mother died, and those requests were granted (Filing No. 42-3 at 2–3). However, Ms. Tuttle has presented evidence that she did, in fact, give notification and that she was taking time off during her miscarriage. She maintains that she was not aware that Mr. Mason was her new supervisor or that she was required to contact only Mr. Mason regarding time off from work.

Importantly, Ms. Tuttle was never a 'no call-no show'. It is undisputed that she contacted Ryan Jackson, Mr. Mason and/or Ms. Bonner on each date that she was absent from work during the week that she was terminated. Although she did not ask Mr. Mason for time off during the miscarriage, she did contact Ryan Jackson by telephone on Monday and again on Wednesday by both telephone and via the email through Ms. Bonner. Mr. Mason's cell phone records show that Ms. Tuttle contacted him directly on Tuesday. On Thursday, Ms. Tuttle spoke to Ryan Jackson and on Friday, the day that she was terminated, she called in and spoke to Mr. Mason.

It is undisputed that the general manager Ryan Jackson was aware that Ms. Tuttle was suffering a miscarriage. It is suspicious that Ryan Jackson himself did not inform Mr. Mason that Ms. Tuttle had contacted him regarding her situation and it is suspicious that despite having a written policy of gradual discipline, Ms. Tuttle was terminated immediately.

Mr. Mason viewed as insubordination that Ms. Tuttle did not inform him personally that she would not be coming to work. However, Ms. Tuttle did not meet Mr. Mason until Tuesday March 5, 2013. Mr. Mason asserts that he decided to terminate her the next day, on Wednesday, March 6, 2013 for insubordination; despite that she contacted the general manager who had been

her reporting supervisor since her employment began. Ms. Tuttle has offered sufficient evidence to show that this reason is pretextual[1] and that her alleged insubordination is not a legitimate, nondiscriminatory reason for her termination.

The circumstances of this case present numerous questions for the trier of fact to determine whether the termination for insubordination was pretext. Accordingly, Advanced Roofing is not entitled to summary judgment on Ms. Tuttle's claim of wrongful termination based on pregnancy discrimination.

## IV.  CONCLUSION

For the foregoing reasons, Defendant Advanced Roofing Systems, Inc.'s Motion for Summary Judgment (Filing No. 32) is **GRANTED in part and DENIED in part**. Summary judgment is denied on the claim for wrongful termination based on pregnancy discrimination, and granted as to all other claims.

**SO ORDERED.**

Date: 1/15/2016

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

---

[1] The Court acknowledges that there is evidence in the record from which a jury could reach the contrary conclusion. At the summary judgment stage, however, "it is not our role to evaluate the weight of the evidence, to judge the credibility of witnesses or to determine the ultimate truth of the matter, but simply to determine whether there exists a genuine issue of triable fact." *South v. Illinois Envtl. Prot. Agency*, 495 F.3d 747, 751 (7th Cir. 2007).

DISTRIBUTION:

Shawn A. Neal
DEFUR VORAN LLP
sneal@defur.com

Scott E. Shockley
DEFUR VORAN LLP
sshockley@defur.com

Daniel J. Gibson
DELK MCNALLY
gibson@delkmcnally.com

Jason R. Delk
DELK MCNALLY
delk@delkmcnally.com